UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MONEY MAILER, LLC,

    Plaintiff,

v.

WADE G. BREWER,

    Defendant.
_____

WADE G. BREWER,

    Counterclaim Plaintiff,

v.

MONEY MAILER, LLC, *et al.*,

    Counterclaim Defendants.

NO. C15-1215RSL

ORDER GRANTING IN PART BREWER'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Wade G. Brewer's "Motion for Partial Summary Judgment for Violations of FIPA and CPA." Dkt. # 105. Brewer alleges that, pursuant to his contract with Money Mailer Franchise Corporation ("MMFC"), he was required to purchase goods and service from Money Mailer, LLC ("MMLLC") and that the franchisor marked up the charges for printing services by over 100% without adequate disclosure. Brewer seeks a summary determination that these practices violated the Washington Franchise Investment Protection Act ("FIPA") and the Washington Consumer Protection Act ("CPA").

ORDER GRANTING IN PART BREWER'S
MOTION FOR SUMMARY JUDGMENT - 1

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact that would preclude the entry of judgment as a matter of law. The party seeking summary dismissal of the case "bears the initial responsibility of informing the district court of the basis for its motion" (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) and "citing to particular parts of materials in the record" that show the absence of a genuine issue of material fact (Fed. R. Civ. P. 56(c)). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to designate "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324. The Court will "view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." Krechman v. County of Riverside, 723 F.3d 1104, 1109 (9th Cir. 2013). Summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor. FreecycleSunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Having reviewed the memoranda, declarations, and exhibits submitted by the parties and having heard the arguments of counsel, the Court finds as follows:

## BACKGROUND

As the Court has previously summarized (Dkt. # 47 and # 103), MMFC contracts with franchisees to operate direct mail advertising businesses within a franchised territory. MMFC requires franchisees to contract with MMLLC for various goods and services that are deemed integral to the franchised business, including "printing and inserting advertisements into shared mail envelopes, list procurement, and freight procurement for delivery to the United States Post Office." Dkt. # 22-1 (MMFC Franchise Disclosure Document) at 12. Until 2013, MMLLC performed the printing and other production services itself, but transitioned those activities to third party Trend Offset Printing Services pursuant to an agreement dated November 15, 2012. Dkt. # 109-6.

MMFC and MMLLC are separate entities, but there is significant organizational overlap between the two companies. Many of the senior officers and managers are the same. In addition, to requiring franchisees to pay MMLLC for all of their printing, production, distribution, and mailing needs, MMFC also allows MMLLC to bill and collect charges, fees, and royalties from franchisees on behalf of both companies. The companies, hereinafter referred to together as "Money Mailer," do not dispute that they operate as one for purposes of FIPA. Dkt. # 122 at 16.

When Brewer signed a ten-year franchise agreement with Money Mailer in June 2011, he was aware that he would have to purchase shared mailing production services from the franchisor (Dkt. # 22-1 at 12, 28, and 39-40). He was specifically informed that printing costs would average $115 per spot,[1] that other costs related to the production of the shared mailing would be approximately $2,245 per month, and that he would be charged royalties and marketing fees at specified rates. Dkt. # 22-1 at 21; Dkt. # 22-4 at 66-67. MMLLC's price lists at the time show that the lowest price it was charging for printing services was $118 per spot. Dkt. # 109-2 at 2. Other types of production goods and services, including envelopes, the creation of mailing lists, insertion, and postage, were separately listed and billed. Dkt. # 109-2 at 3. By 2014, the printing and fixed costs had increased by 4-5%. Dkt. #109-4 at 2-3. There is no evidence that Brewer had or was given any information regarding Money Mailer's costs for these goods and services. Nor is there any indication that the prices listed for printing costs included reimbursement for any other expenses or services.

Starting in 2012, Brewer began complaining about errors in the invoices and statements issued by Money Mailer. Brewer asserted that credits he had received had been retroactively reversed and that Money Mailer reneged on agreements regarding credits and pricing. He also began to suspect that Money Mailer was not providing freight services at cost and requested documentation regarding those charges. Dkt. # 26 at ¶ 9. In September 2015, Brewer alleged in

---

[1] A "spot" includes 10,000 printed ads.

support of his counterclaims that Money Mailer was charging unreasonable fees and costs that had no relationship to the actual costs incurred, identifying handling, zone handling, postage, printing, and freight charges as examples. Dkt. # 12 at ¶¶ 1.8, 3.5, and 4.2. Brewer did not provide any specifics regarding the alleged overcharges: at the time, his theory seemed to be that Money Mailer's practice of offering credits and rate changes was evidence of a markup of some unknown amount. At various points, he alleged that his efforts to obtain evidence or documentation regarding Money Mailer's true costs for freight, printing, and other services had been rebuffed. Dkt. # 12 at ¶¶ 3.35, 3.39, and 3.40.

During discovery in this litigation, Money Mailer produced a 2014 Advisory Board PowerPoint presentation that showed that the average cost to print a spot was $44.53 in 2012 and $37.22 in 2014. Dkt. # 109-1 at 32. According to Money Mailer's own calculations, it was receiving per spot revenue of $97.13 in 2012 and $98.60 in 2014. Id.[2] Thus, Money Mailer internally claimed a 118-165% mark up of its printing costs as one of its "Key Financial Metrics." Money Mailer does not deny that it charges franchisees twice what it costs to print the advertisements.

## DISCUSSION

**A. Violation of FIPA**

FIPA imposes certain rights and prohibitions on the relationship between a franchisor and a franchisee, often referred to as the franchisee's bill of rights. Of particular importance in the context of this motion is the statutory declaration that it is an unfair or deceptive act and a violation of FIPA for any person to "[s]ell, rent, or offer to sell to a franchisee any product or

---

[2] The Court is not making a finding regarding the exact cost of printing in any given year. Money Mailer's 2012 contract with Trend Offset Printing Services anticipated costs of $46.21-$54.54 per spot, which are significantly higher than the numbers reported to the Board for 2013 and 2014. Dkt. # 109-6 at 33-36.

ORDER GRANTING IN PART BREWER'S
MOTION FOR SUMMARY JUDGMENT - 4

service for more than a fair and reasonable price" RCW 19.100.180(2)(d).[3] Selling printing services to a franchisee at more than twice what those services cost violates this provision. While it is likely that the courts of Washington would find that any percentage markup on the costs of materials is a violation of FIPA (see Nelson v .Nat'l Fund Raising Consultants, Inc., 64 Wn. App. 184, 191-93 (1992)),[4] the Court need not resolve that issue to find that, as a matter of law, selling a franchisee printing services for twice what they cost is not a "fair and reasonable price." To hold otherwise would allow undisclosed profit centers and vitiate FIPA's essential purpose to protect franchisees "from oppressive practices historically associated with the sale of franchises." Rutter v. BX of Tri-Cities, Inc., 60 Wn. App. 743, 748 (1991).

Money Mailer argues that it provides such overwhelming benefits to its franchisees in the form of its integrated printing-insertion-mailing methodology that the prices it charges for printing are eminently reasonable. This argument fails, both on the law and on the facts. As a matter of law, huge markups in the price of a product or service that a franchisee is required to purchase from the franchisor are simply not permitted. The market has established a fair and reasonable cost for the type of printing services provided to the franchisees. It cost Money Mailer approximately $45 per spot to do it in-house, and it was able to obtain the same printing services from a third party for approximately $38 per spot. It is both unreasonable and unfair to charge the franchisees two or three times that much. As a matter of fact, Money Mailer

---

[3] Because Money Mailer acknowledges that MMFC and MMLLC acted together as the franchisor for purposes of FIPA, monies MMFC received from MMLLC do not trigger the prohibition of RCW 19.100.180(2)(e). A claim under that subsection may still be in the offing, however. If, as contemplated in the Production Services Agreement with Trend Offset Printing Services, Trend's actual revenue triggered the rebate provisions of ¶ 3.5.2 and Money Mailer failed to pass the rebate on to its franchisees, Brewer may be able to establish a violation of RCW 19.100.180(2)(e). He has not done so at this time.

[4] The Washington Court of Appeals was not at all concerned with the exact percentage of the mark up. It was the simple fact that the franchisor was marking up the wholesale price which gave rise to a violation of RCW 19.100.180(2)(d)'s prohibition against "charging more than a reasonable rate for supplies purchased under a requirements contract." 64 Wn. App. at 193.

ORDER GRANTING IN PART BREWER'S
MOTION FOR SUMMARY JUDGMENT - 5

separately charged franchisees for printing, insertion, envelopes, mailing list generation, postage, royalties, and a host of other services. See Dkt. # 109-3. Whatever benefits are bestowed by its system, Money Mailer is adequately compensated through its disclosed fees and charges for the component parts. There is no justification for marking up the printing prices to pay for products and services for which the franchisee is already paying.

Money Mailer also argues that Brewer's statutory claims are barred by a four year statute of limitations and/or the doctrine of laches. There is no indication that Brewer knew or should have known that Money Mailer was overcharging for printing services before discovery in this case disclosed how little it was actually paying for those services. Huge markups are forbidden by FIPA, and Brewer cannot be faulted for assuming that Money Mailer would follow the law. Money Mailer has the burden of proof on these defenses, but has not come forward with evidence to support them.

Brewer has established a violation of RCW 19.100.180(2)(d) and is entitled to a summary determination of that fact.

**B. Private Right of Action Under FIPA**

The question then becomes, how does a franchisee vindicate the rights afforded him or her under FIPA's bill of rights? Brewer argues that he has a direct cause of action under both FIPA and the CPA for violations of RCW 19.100.180(2). Money Mailer maintains that FIPA provides a remedy only where the violation arises from the sale of or offer to sell a franchise and that a violation of a right or prohibition under RCW 19.100.180 gives rise to a potential claim under the CPA, not FIPA.

FIPA declares that a violation of RCW 19.100.180(2), such as occurred here, is an unfair or deceptive act or practice for purposes of the CPA. RCW 19.100.190(1). No other remedy is specified. On the other hand, a suit for damages, treble damages, and/or recision can be brought under FIPA where a person "sells or offers to sell a franchise in violation of this chapter . . . ." RCW 19.100.190(2) and (3). The language of the statute therefore suggests that the remedy

varies with the nature of the violation. A straightforward reading of the statute leads to the conclusion that, because the wrongs regarding which Brewer seeks summary judgment[5] arose after he purchased the franchise, the remedies afforded in RCW 19.100.190(2) and (3) do not apply, and his relief, if any, can be found under the CPA.

Neither party cites to any relevant legislative history regarding the remedies available for a violation of the franchisee bill of rights. The only case to make more than passing reference to the issue states that "subsections (1) and (2) of RCW 19.100.190 appear to be mutually exclusive in terms of whether the claimed violation is associated with the sale of the franchise to the franchisee, or the relations of the parties once the franchise comes into existence." Payless Car Rental Sys., Inc. v. Draayer, 43 Wn. App. 240, 245 (1986). Other courts have come to the same conclusion, although with very little analysis. See Red Lion Hotels Franchising, Inc. v. MAK, LLC, 663 F.3d 1080, 1087 (9th Cir. 2011) ("FIPA does not specify a remedy for a violation of the bill of rights, but a franchisee may bring an action under Washington's Consumer Protection Act based on a FIPA violation."); BP W. Coast Prods., LLC v. Shalabi, C11-1341MJP, 2010 WL 2277843, at *8 (W.D. Wash. June 14, 2012) ("The CPA itself provides the sole cause of action to enforce violations of these provisions of . . . FIPA."). The one exception is Saleemi v. Doctors's Assocs., Inc., 176 Wn.2d 368, 386 (2013), in which the Washington Supreme Court awarded attorney's fees under RCW 19.100.190(3) for a bill of rights violation. No analysis is provided. The Court finds that the statute unambiguously limits liability for damages, rescission, and attorney's fees under FIPA to "any person who sells or offers to sell a franchise in violation of this chapter." Because Brewer has shown that Money Mailer violated FIPA's bill of rights and has not accused it of violations in the offering or selling of the franchise, there is no direct cause of action under FIPA.

---

[5] Brewer has also alleged misrepresentations in the offer and sale of the franchise. If he is able to prove those allegations, a direct cause of action under FIPA may be available.

ORDER GRANTING IN PART BREWER'S
MOTION FOR SUMMARY JUDGMENT - 7

## C. Consumer Protection Act

In his motion, Brewer points out that a violation of FIPA also constitutes an unfair or deceptive act under the CPA (Dkt. # 105 at 10), but does not attempt to show that all five of the elements of a CPA claim are satisfied. See Nelson, 120 Wn.2d at 393. He cannot remedy this deficiency in reply.

## CONCLUSION

For all the foregoing reasons, Brewer's motion for summary judgment is GRANTED in part. The Court finds as a matter of law that Money Mailer violated RCW 19.100.180(2)(d). Brewer has not, however, shown that he is entitled to a judgment regarding his claims under RCW 19.100.180(2)(e) or the Consumer Protection Act: the motion is denied without prejudice as to those issues.

Dated this 28th day of June, 2018.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge