```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3   _____

 4                                )
     MONEY MAILER, LLC,           ) C15-1215-RSL
 5                                )
                    Plaintiff,    ) SEATTLE, WASHINGTON
 6                                )
     v.                           ) June 6, 2018
 7                                )
     WADE G. BREWER,              ) Motion Hearing
 8                                )
                    Defendant.    )
 9
10   _____

11             VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT S. LASNIK
12             UNITED STATES DISTRICT JUDGE
     _____

13

14   APPEARANCES:

15

16

17    For the Plaintiff:      Nathan Thomas Alexander
                              Dorsey & Whitney
18                            701 Fifth Avenue
                              Suite 6100
19                            Seattle, WA  98104

20
      For the Defendant:      Daniel Andrew Brown
21                            Daniel Velloth
                              Adam Rosenberg
22                            Williams Kastner & Gibbs
                              Two Union Square
23                            601 Union Street
                              Suite 4100
24                            Seattle, WA  98101

25
```

 1          THE CLERK:  Case C15-1215-L, Money Mailer versus Wade

 2     Brewer.  Counsel, please make your appearances.

 3          MR. ALEXANDER:  Nathan Alexander with Dorsey Whitney

 4     on behalf of plaintiff and counterclaim defendants, Money

 5     Mailer Franchise Corp., and Money Mailer LLC.  I am joined at

 6     counsel table, and it's my pleasure to introduce you to Joe

 7     Craciun from Money Mailer, general counsel.

 8          THE COURT:  Great.  Thanks very much.

 9          MR. BROWN:  Your Honor, Daniel Brown on behalf of

10     Mr. Brewer.  Mr. Brewer is here today in the audience.  On my

11     right is Mr. Velloth and Mr. Rosenberg of my office.

12          THE COURT:  Thank you.

13        Mr. Rosenberg, you changed law firms.

14          MR. ROSENBERG:  I did, Your Honor.

15          THE COURT:  It's good to see you.  Still on that side

16     of the table?

17          MR. ROSENBERG:  I'd get lost over there.

18          THE COURT:  Yeah.  Absolutely.

19        Mr. Rosenberg, in his previous life, was in a firm that

20     would appear in federal court quite a bit.  And then one of

21     my truly landmark cases, *Wilbur v. Mount Vernon*, which is --

22     I told my career law clerk L.B., this is one that would be

23     sort of tombstone material for how important it was and how

24     novel it was.  And Mr. Rosenberg did a very nice job for his

25     client, the cities of Mount Vernon and Burlington.  But you

1    were on the losing end of the case.

2        But the cities accepted the ruling, didn't appeal, and

3    actually used it for a wake-up call for the fact that they

4    were not providing indigent defense systems that they should

5    have been, and even sort of proselytized to other cities in

6    the State of Washington:  Don't get caught like we did, kind

7    of asleep, and upgrade your indigent defense system.  So it

8    really was a win/win in that sense.  Don't you think, Adam?

9            MR. ROSENBERG:  If you're going to lose, it's good to

10   lose and makes society a little bit better.

11           THE COURT:  A better place.  Good enough.

12       Well, we are here on Mr. Brewer's motion for partial

13   summary judgment.  And I take it, Mr. Brown, you'll be making

14   the argument?

15           MR. BROWN:  I will.  Ready, Your Honor?

16           THE COURT:  Very ready, yes.

17           MR. BROWN:  Just feel free to jump in with any

18   questions that you have, Your Honor.  I know you're not shy

19   about that.

20           THE COURT:  Right.

21           MR. BROWN:  You know, reading this again yesterday,

22   as I did before the hearing just to get prepared, it almost

23   felt like the peerless from law school.  It's like the two

24   briefs passing in the night.  And I kept saying, why is that?

25   And I realize it's because half of Money Mailer's brief on

1  their facts, which is about half of it, doesn't address the

2  facts that are at issue for this motion, at all.

3       Mr. Carr's declaration admits, in the smallest way

4  possible, that there were markups made.  But, you know, they

5  don't want to talk about the amounts.  So what we have here

6  is a few admissions and a ton of non-denials, which are

7  admissions for purposes of summary judgment.  And I want to

8  go over a few of those, Judge, with you right now.

9            THE COURT:  Okay.

10           MR. BROWN:  They do admit that they marked up the

11 printing costs.  And they admit something that we suspected

12 but we still don't know in discovery, which they may have

13 marked up a little, they say, other fixed costs; which is

14 like being a little pregnant.  And that's a problem under

15 FIPA, Your Honor.  So we've got a new admission that they've

16 got other problems.

17      They don't deny that the markups on the printing were

18 somewhere between 110 percent -- I'm rounding the number,

19 Your Honor -- up to 150 percent, at times.  They don't deny

20 that there was a kickback, which is violative of the

21 anti-kickback provisions of FIPA, from trying to offset

22 printing, in third-party printing.  They don't deny that.

23 But we provided the actual contract that we did get in

24 discovery, that actually calls it out that there's going to

25 be a rebate.

1          They don't deny that they told franchisees, like

2    Mr. Brewer, that they were able to get the most advantageous

3    printing from a party like Trend Offset because of their

4    economic might.  You know, we've got, what did they say, 175

5    franchisees in 35 states, and we went out and got the best

6    deal possible.

7          They also don't deny that they never told Mr. Brewer that

8    they were marking up those printing costs between 110 percent

9    plus, or on the other charges as Mr. Carr has admitted.

10         They don't deny that they ever told Mr. Brewer there was

11   any markup at all.  They never said that.

12              THE COURT:  But Mr. Brewer does not deny that they

13   told him what the costs would be?

14              MR. BROWN:  Total costs, right.  So, Your Honor, if

15   you say -- I like using analyses -- you're going to go buy

16   the pizza dough and the cost is going to be $25 for the pizza

17   dough.  Okay.  But the cost is really only $12 to us, and

18   we're marking it up another $13.  And that didn't get said.

19   And that's a problem.  Because *Nelson*, Your Honor, actually

20   dealt with that issue.  In *Nelson*, they told the franchisee,

21   hey, there's a markup in this price you're getting.  And the

22   court said, that's not sufficient.  They even told them

23   there's a markup.  And they figured it out right away, it's a

24   20 percent markup.  And the court said, no, you've got to

25   tell them all this before you enter into the contract, not

1   after the fact.

2          THE COURT:  And you think this is something unique to

3   the Franchise Act?  I mean, an ordinary contract, 20 percent

4   markup wouldn't necessarily be considered unconscionable,

5   would it?

6          MR. BROWN:  No, because under the Franchise Act,

7   which is the whole idea if you look at the statutory history

8   -- and *Nelson* talks about it and the other cases -- it's

9   about maximizing disclosures, minimizing overreaching, and

10  trying to correct this grand overplay of power, right?  We

11  have Money Mailer that's got all the information, all the

12  knowledge, all the experience.  And they're selling -- it's

13  money in your mailbox, Your Honor, that's what they're

14  selling, right?  That's their little tag-line is, "It's money

15  your mailbox."  It's money in their mailbox.

16         THE COURT:  And it goes right into my recycling.

17         MR. BROWN:  It's a tough -- direct-mail marketing is

18  obviously tough.

19         THE COURT:  Very tough.

20         MR. BROWN:  It's really tough when you don't know

21  what you're paying for, and you think you're getting a good

22  deal.  And you think, oh, yeah, they went out and got the

23  best price for me.  And now we find out, actually more

24  information we didn't have, Your Honor.  They're shoving

25  overhead into the printing costs.  And the whole overhead for

1  the business they put into printing costs.  And a little bit

2  somewhere else.  We don't know where that is yet.  Mr. Carr

3  doesn't give us the specifics, but we're going to find it.

4  They're putting it all there.  They put the overhead there.

5      Now, if they try to divide it, like in *Nelson*, they tried

6  to make the argument:  Well, let's use the costs, Your Honor,

7  of the materials.  Then we're going to have a royalty fee.

8  Let's treat it that way.  And the Supreme Court said:  No,

9  you don't get to do that either.

10      But more importantly, they didn't do that.  They said to

11  Mr. Brewer:  Here's your costs, let's say it's $50 a spot,

12  and we're going to charge you an extra $50 for this super

13  secret proprietary process we have.  Now, they did spend a

14  lot of pages, by my count about 19 times in the brief and the

15  declaration, about their proprietary costs.

16      If you know what it is, Your Honor, you're way ahead of me

17  on this game, because I still don't know what it is.  It's

18  super secret.  But they do say that they trained a vendor.

19  Well, we know who that vendor is.  They trained Trend to do

20  all the stuff that's secret.  But Trend is already charging

21  them for that.  So I don't think Trend is charging them

22  twice.  Trend is charging them for all that, all the stuff

23  Trend is doing.  And then they slap on another 110 to

24  150 percent.

25      You know, they don't also deny that Mr. Brewer didn't know

1    about that kickback from Trend.  And they don't deny that

2    they never told him about it.  They don't deny that.

3        So the question is, what facts do we have to have to

4    establish a violation of FIPA?  Well, we've got them.

5    There's undisclosed markup.  That's it.  End of story.  Got

6    to disclose it.

7        And you kind of asked me if this was peculiar to the

8    Franchise Act, Your Honor.  I think it's actually peculiar to

9    the franchise.  And I always like to figure out why I think

10   something happened.  I'm going to surmise here, but I'm going

11   to say what I think.

12       I think being in so many different jurisdictions, Money

13   Mailer FC, the franchise corp thought, we're going to set up

14   Money Mailer LLC, right?  They're going to be the ones you

15   buy the services from.  You're going to have a separate

16   contract -- which they never did, obviously, they're supposed

17   to -- and we're going to set it up where we charge a pretty

18   low royalty fee, and a pretty low franchise fee to begin

19   with.  And that's going to be nice and low.

20       And then we're going to go ahead and put all of our

21   charges and all our overhead in the other company.  And we're

22   not going to tell these guys about it, and they're going to

23   pay it, and they're going to think:  Well, this is a pretty

24   good franchise, I don't have to pay a lot of royalty fees.

25   I'm getting this good printing deal, it's the best deal they

1  could find.  That sounds like a good deal.  And they don't

2  know about it.  And they thought that was okay.  Probably

3  because they are in too many states, Your Honor.  Maybe it's

4  okay in other states.  It's not okay in Washington.  You have

5  to disclose.

6      And you know why I think this is the story?  Because

7  earlier in this case -- you're not going to hear it today

8  because it's clear that MMLLC is also a person under the Act,

9  and they're stuck with the FIPA provisions -- earlier in the

10 case they tried to argue:  We're not subject, MMLLC is not

11 subject to FIPA.  I think they actually believed that when

12 they set this whole thing up and they thought, this is how

13 we're going to do it.  I don't know if it works in California

14 or any of the other states they're in.  It doesn't work here.

15 They have to disclose.  That's it.  There's a franchise

16 violation.

17         THE COURT:  And the FIPA doesn't have a damages

18 section.  But you would have to prove, obviously, economic

19 damages.

20         MR. BROWN:  It has a restitution.  It has rescission.

21 It has trebling in whatever damages you prove, Your Honor.

22 Their argument is kind of -- I don't really understand this

23 argument, if you read the statute and how it's constructed.

24 I know they like *Red Lion*, because the Ninth Circuit wasn't

25 dealing with that issue, and was dealing with a complete

1   unresolved issue that had nothing to do with this issue and

2   said:  Oh, there's no remedies.  Well, there's remedies all

3   over the statute.  I guess they want you to shake your finger

4   at them, Your Honor, three times, treble.  Bad franchisor.

5          THE COURT:  But you also are claiming that you

6   deserve summary judgment on your Consumer Protection Act.

7   Aren't there other elements on the CPA claim?

8          MR. BROWN:  Well, there are, but we think we've

9   proved them.  Let's go through them.  First of all, unfair

10  and deceptive.  That's checked.  Right?  Public interest.

11  That's checked under the statute, too.  The case law says one

12  thing and the legislature said, no, this is a public

13  interest.  We've satisfied that.

14      So now what's left?  Trade or commerce?  Well, I don't

15  think anybody -- they're not going to argue this wasn't in

16  the trade or commerce.  This wasn't a personal thing, this

17  was clearly a business in 35 states, 175 franchisees.  And

18  Mr. Brewer is doing business.

19      Mr. Brewer is injured.  We allege Mr. Brewer overpaid on

20  these illegal charges.  They're illegal under FIPA.  He

21  overpaid them.  They don't deny that.  Another non-denial,

22  Your Honor, another admission by denial is that he paid

23  hundreds of thousands of dollars in excess on these markups.

24  So, there's clearly damage.

25          I think it's Perrag -- what's the case -- the *Panag* case

1   in Washington talks about damages.  Frankly, if you pick up a

2   phone and call a lawyer, Your Honor, that's damages.  I mean,

3   damages is almost presumed under the CPA, to be honest.  But

4   we have way more than that allegation.  And again, they don't

5   go through and say, well, Mr. Brewer didn't pay anything on

6   these extremely marked up printing costs over the years.  He

7   paid hundreds of thousands of dollars on just those alone.

8   So clearly he's been damaged.

9        And the fifth one is, is it proximately based upon the

10  wrongful conduct?  Well, yeah, if they hadn't marked it up

11  illegally, he wouldn't have paid it.  So, I think we meet all

12  those.

13       Their defense to this, rather than take on any of those

14  facts, which are so obvious, Your Honor, they say:  Well you

15  didn't say those words, Mr. Brown, in your brief.  You just

16  said you're liable under CPA.  And you didn't go through and

17  explain how this would be in trade or commerce.

18       Well, I'm sorry, Your Honor, we only have so many pages in

19  these jurisdictions.  And I wouldn't think we need to waste

20  time on that.  But if the court needs more briefing, Your

21  Honor, we can supplement this in a day.  I could probably

22  supplement it by the end of the day.  I mean, it's pretty

23  obvious.

24       So the CPA has also been established.  And they have

25  different remedies, right?  FIPA gives you treble damages

1   possibility.  CPA gives you treble damages, but limited to an

2   amount.  Attorneys fees are not mandatory under FIPA.  You

3   get some other remedies under FIPA that you wouldn't get in

4   CPA.  You get the equitable remedies.  You get recision.  You

5   get all kinds of things.  So there's clearly remedies.

6       And we're not here about remedies, though, right?  That's

7   another point, Your Honor, this is not a motion about

8   remedies.  This is a motion about liability.  We'll be

9   dealing with that, trust me, as this case goes forward, what

10  the remedies are and what Mr. Brewer elects as his remedies.

11      I guess really that takes us down to what real defenses do

12  they have that they raise in the motion, besides what you and

13  I just talked about?  And I'd say they raised laches.  I

14  don't know if I really have to address laches.  We addressed

15  it in the brief.  They don't allege prejudice, I guess their

16  prejudice would be over this lawsuit, which is never

17  sufficient prejudice to justify laches.  You have to have a

18  different kind of prejudice.  Otherwise it would always be

19  laches, every time.  You sue me tomorrow.  Oh, that's laches,

20  I'm now in a lawsuit.

21      Statute of limitations.  They cite an unpublished case for

22  the proposition, which has also the language that we cited,

23  which we relied on, and other cases that said:  Look, you hid

24  it from us.  Trust me, Your Honor, I would have been here two

25  years ago with this motion if I had that document that we now

1  have.  They wouldn't give it to us.  And I'm sure you recall,

2  Your Honor, I was standing right here, we argued about this

3  and I said:  We think they're doing this.  We can't prove it

4  yet, but we're going to get this discovery.

5      And we have new counsel now, and we've got the discovery,

6  and there's the document.  They don't say that document was

7  something else.  They don't say, oh, it was a marketing tool

8  or it was a pro forma.  No, they just let it sit there and

9  say, yep, we're marking it up, we're shoving our overhead in

10  there and other costs in there, because we provide this super

11  service, this super-secret service.

12      I don't know if that's true or not.  But it doesn't matter

13  under FIPA.  They can't get away from it on that.  *Nelson*

14  doesn't allow that.  None of the case law allows that.

15              THE COURT:  Mr. Brown.

16              MR. BROWN:  Yep.

17              THE COURT:  I think I'm going to give my court

18  reporter a little rest now and have you deal with the rest in

19  rebuttal.

20              MR. BROWN:  Yep, that would be great, Your Honor.

21              THE COURT:  The court reporters love me because I

22  take care of them.

23      Okay.  Mr. Alexander.  And you'll win a lot of points if

24  you just slow it down a little bit.

25              MR. ALEXANDER:  I will do my best, Your Honor.

1          THE COURT:  He was fast, wasn't he?

2          THE COURT REPORTER:  Yes, Your Honor.

3          MR. ALEXANDER:  Mr. Brown summed up their summary

4    judgment motion as FIPA requires markups.  And because there

5    were undisclosed markups, you have a violation of FIPA and

6    they're entitled to damages.  That's simply not the law and

7    it's not supported by the facts of this case.

8          Details matter.  The very detailed declarations that came

9    in from Mr. Martin, who was the director of plant operations,

10   as well as the declaration from Ryan Carr, the CFO for Money

11   Mailer FC, Money Mailer LLC, and even Money Mailer Holding

12   Corporation, goes through a very detailed explanation of what

13   their actual costs were to get to what?  An end product.

14         Money Mailer's system is based around providing an

15   envelope filled with advertisements that will correctly go to

16   over 1,400 zones.  And as Mr. Carr described it, it is over

17   500 million advertisements that go into those mailings each

18   and every mailing, 12 during the year.  So we're talking

19   about billions of advertising across over 175 franchisees, 35

20   states, culling all that information, putting it together, in

21   what Mr. Martin describes is a very detailed process by which

22   they create the printing plates that are then given to Trend

23   Offset to execute the printing.

24         Trend Offset was able to do so several years after

25   Mr. Brewer became a franchisee, by the way.  But Trend Offset

1    was able to do so after extensive investment training from

2    Money Mailer as to their entire integrated system that allows

3    this franchise to work.

4         And Mr. Carr's declaration is unrebutted that Money Mailer

5    had certain costs that were actual costs in producing those

6    mailings, and that they were very close to what they were

7    charging Mr. Brewer.  If you look at his declaration,

8    particularly paragraphs 18 through 24, and he actually

9    provides the backup data to support those, as well as

10   schedules to do the math.  We can see that of course there

11   were markups.  We don't shy away from markups.  That's how

12   businesses are conducted.  There has to be some value that

13   they're adding to the franchises.  And then they're paid for

14   that.

15        THE COURT:  But what about disclosure?

16        MR. ALEXANDER:  Sure.  I say that the facts

17   demonstrate, rather, that there is adequate disclosure under

18   the FDD, under all of the various pieces of information that

19   were given to Mr. Brewer, under his research prior to

20   joining.  The FDD is interesting.  It discloses fully who all

21   the players are.  Money Mailer Franchise Corporation, as the

22   franchisor; Money Mailer LLC as the operations company; Money

23   Mailer Holding Company, that is the parent to both of those

24   entities.  It fully discloses that the money Money Mailer

25   makes is derived almost entirely from Money Mailer LLC, the

1   operations of the business.  And it indicates that in Item 8

2   of the FDD.

3       It even is so precise as to say, you're going to have

4   fixed costs and variable costs, printing and art costs that

5   are going to be in addition to the fixed costs, about 115 per

6   spot, for you to carry out this business.

7       As it turns out, Mr. Brewer paid far less than that.

8   There were economies that were built into it, and those

9   savings were passed on to the franchisee.  What we have to

10  establish today is that there are disputed issues of fact as

11  to every element of the claim that would be required for them

12  to win judgment against Money Mailer.  And so the law is

13  incredibly important and it's been misstated.  But the law is

14  important as to what's being alleged today.

15      They are alleging violations of two provisions of Section

16  180 of the Franchise Act, which is called the Bill of Rights,

17  for shorthand.  The two provisions are:  One, you have to

18  sell goods and services at a fair and reasonable price.

19  That's under Subsection D.  Then Subsection E says:  If

20  you're obtaining any benefit from a third party, you have to

21  disclose that benefit.  They did all of that.

22      There cannot be just a mere statement from Brewer:  I

23  found an internal document that says the printing costs are

24  $44.53 -- I'll throw out as one of the examples -- that is a

25  fully burdened printing cost.  They're actually charging me

1   over $95.  Wow, that is 110 percent markup.  He is

2   incompetent to provide that kind of evidence, because he has

3   no idea what that line in that PowerPoint presentation even

4   means.  And that was fully disclosed as a part of the

5   declarations from Mr. Carr and Mr. Martin.

6       There is a printing cost that first the LLC kind of

7   carried out, then Trend Offset carried out, to actually

8   physically print out the product.  Then there's an insertion

9   charge.

10      But beyond that, there are all sorts of expenses and costs

11  that get us to the final product, and that's what this is all

12  about.  How much are we charging you to have your stack of

13  envelopes that you can send to your zones?  All of that

14  information was adequately disclosed.  The question is

15  whether it's a fair and reasonable price, not did it have a

16  markup.

17      And certainly *Nelson*, nor the legislature, even implied

18  that 20 percent was somehow a per se line in the sand, above

19  which you would have a violation of FIPA.  In fact, we cited

20  to the legislative history that said specifically, we're not

21  setting such a line.  There has to be a determination of what

22  the market is setting for these goods and services.

23              THE COURT:  So are you saying the Supreme Court's

24  decision in *Nelson* is just flat out wrong, that it didn't

25  take account of legislative history?  Or are you saying it's

1    a distinguishable case?

2          MR. ALEXANDER:  I'm saying it's a distinguishable

3    case.  I don't think *Nelson* even attempted to try to pass a

4    ruling on a 20 percent markup.  There is not enough

5    information from the court's decision, as well as the record

6    that we could see, as to why 20 percent was excessive or an

7    unfair and unreasonable price.

8        We can sort of guess to that, because what was being

9    provided in *Nelson* was basic pizza ingredients.  And by the

10   way, Mr. Brown is wrong, the franchisees did not know what

11   the price was.  They were told that after they got their

12   first bill, which was after they signed their franchise

13   agreement.  Then they realized, oh, they're slapping on a

14   20 percent markup to ordinary old, you know, dough, and other

15   ingredients for the pizza.  And the court took particular

16   note of that.

17       And then the rationalization was, well, this 20 percent,

18   really it's a franchise fee.  And the court said, no, you

19   can't just change the character of that payment.  There

20   wasn't a discussion as to 20 percent in and of itself sets

21   the mark for what is unfair and unreasonable.

22         THE COURT:  So you're saying it's always going to be

23   a fact issue about whether the costs are reasonable, not

24   whether you failed to disclose what the markups were?

25         MR. ALEXANDER:  Correct.  The first inquiry has to

1   be, is it a fair and reasonable price?  And then, did you

2   receive something in benefit that you didn't disclose to the

3   franchisee?  Well, they disclosed fully what the costs of

4   those printings would be, and what Money Mailer LLC would be

5   obtaining for providing those services.

6       They used the term "kickback".  There are no kickbacks in

7   this case.  There's been zero evidence of it.  A kickback is

8   when a vendor charges the buyer a certain price, and then

9   pays back to the buyer a certain amount of money.  Kickbacks,

10  of course, are illegal because they avoid taxes.  There's all

11  kinds of reasons why the law has a problem with kickbacks.

12      What they point to -- and of course they don't show you

13  the language, they just say:  Oh, and Trend Offset, their

14  contract even had evidence of a kickback.  No.  That merely

15  said that there would be volume discounts.  The more you

16  print, the less it will be.  And guess what?  They passed

17  those savings on to the franchisee.

18      Mr. Brewer, in fact, benefited from that.  The more you

19  print, the less it will cost for those printings.  That's why

20  the price went down from $115 per spot, all the way down to

21  what he was paying, which was in some cases $94, some cases

22  $88.  And you can see that from looking at the math in

23  Mr. Carr's declaration.  So he clearly was receiving the

24  benefit of the lower costs.

25      Volume discounts are not kickbacks.  There was no money

1   being paid back from Trend Offset to Money Mailer.  There was

2   no money being paid from Money Mailer LLC to Money Mailer

3   Franchise Corp.  They provided the services.  Money Mailer

4   Franchise Corp provided the franchise and required the

5   royalties.  They were separate fees.  They were collected

6   separately.  So there isn't a disclosure issue here at all.

7        What this boils down to is really Mr. Brewer just didn't

8   run his franchise in a way that would have ensured success.

9   He didn't charge enough for his spots.  And he didn't sell

10  enough spots.  When you have the price structure that's fully

11  disclosed under the FDD, it's very apparent that this is what

12  you're going to pay in terms of getting this end product out

13  the door.  And if you sell more ads or sell your ads for

14  more, everything above that is more and more profit to

15  yourself.  And he just simply didn't do that.

16       So as Mr. Carr described, you know, he could have -- we

17  didn't -- Money Mailer did not earn much, if any, profit on

18  him.  It was perhaps 3 percent in some months.  And he gave

19  another extreme example of 15 percent.  The whole operation

20  makes between 2.2 and 5 point -- I think it was -- I'm

21  blanking on the number, 5.8 perhaps in total profit on the

22  entire enterprise.  So this isn't a matter of where they're

23  just trying to put all of this on the backs of the poor

24  unsuspecting franchisee.  They were fully aware of

25  everything.

1        THE COURT:  If there is a franchise, a FIPA

2   violation, is it a per se CPA violation?  And if not, what

3   elements of the CPA do you contest?

4        MR. ALEXANDER:  Correct.  180 is very clear, and it

5   fits beautifully with the CPA Act 19.86, that if there is a

6   violation of the Bill of Rights, then you have the unfair or

7   deceptive practice.  So you've met one of your elements of a

8   CPA claim.

9        But you still have to establish the remaining four

10  elements of your CPA claim.  The way that 190 is structured,

11  it's very clear, Subsection 1, if you've got a violation of

12  180, it's a CPA claim.  Period.  End of story.  If you have

13  other violations of FIPA, they fall under Subsection 2.  And

14  there are different remedies.  They're treated a little bit

15  differently.

16       All the case law that we've seen, *Nelson*, the Ninth

17  Circuit, your colleague on the bench, Judge Robart in the

18  Volvo case, looked at that and said, yeah, you've got to make

19  sure you establish every element.  If you only find an unfair

20  and deceptive practice, does not mean that you've found a CPA

21  violation.  You've got to establish the rest of the elements.

22       THE COURT:  Okay.  Thanks, Mr. Alexander.

23  Are you ready for Mr. Brown?

24       THE COURT REPORTER:  Yes, Your Honor.

25       MR. BROWN:  Counsel didn't answer your question, Your

1   Honor.  You asked what elements are they contesting.  We

2   don't know from their briefing, we don't know from the answer

3   to the question, he just said you've got to prove them.  I

4   stand by what I said earlier, which is, what's there left to

5   prove in light of what we alleged and what they haven't

6   responded to?

7        I know you don't do this, Your Honor, but a lot of what

8   Mr. Alexander said is not in declarations.  A lot of it was

9   argumentative, facts, with quotes around it, because they're

10  not supported.  But I will say this.  Mr. Carr's declaration,

11  there's an Exhibit 4 to it, Your Honor, and it talks about

12  this idea that, well, the markup isn't as high as we said it

13  is.  Well, he's right.  The billing to Mr. Brewer on that one

14  that allegedly was picked out of a hat, you know, and said

15  was $72,000 and some change, almost $73,000, and he said the

16  costs were only $62,000 to them.

17       And you're like, well, that's only a $10,000 -- it's

18  actually about a $10,500 markup.  But, again, if you look at

19  that exhibit, guess what they shoved in there?  $13,000 of

20  overhead.  You know, if I wanted to put my building, and the

21  Christmas party for the firm, Your Honor, and the pens and

22  papers, and the rental of all of the FAX machines, and

23  everything else we do, bonuses, all my overhead into printing

24  costs that are a line item on a charge, and say, that's where

25  I'm going to put all my overhead, I don't know how that's not

1  a failure to disclose.  Because he says they disclosed

2  everything.

3      We allege they never told us anything about that.  And

4  where in Mr. Carr's ten-page declaration, or in Mr. Martin's

5  ten-page declaration do one of them ever utter the words:

6  "Yes, we did.  Yes, I did."

7          THE COURT:  What about Mr. Alexander's argument that

8  if the costs are ultimately reasonable, there is no violation

9  here, it needs to be both non-disclosed and unreasonable?

10         MR. BROWN:  That's not what the law says.  That's not

11  what *Nelson* says, for sure.  *Nelson* is very clear.  Failure

12  to disclose is a violation.  That's the very purpose, right?

13  It's the idea, before you suck in the franchisee, you've got

14  to disclose everything, as I quoted the language to you

15  earlier, Your Honor, about the balance of power.

16      I mean, *Nelson* actually uses pretty good language about

17  the inequities here, and they have all the power and

18  knowledge.  And Mr. Brewer and any other franchisee has no

19  bargaining position.  Take it or leave it, right?  They're

20  not begging him.  Well, they might have in this case because

21  he actually took over a corporately run system.

22      I think it's kind of funny that they mention -- they

23  always want to hammer Mr. Brewer.  He didn't charge enough.

24  He charged what they were charging, Your Honor, when he took

25  it.  What's he supposed to do, go to the dry clearer and say:

1  Hey, I'm the new owner, they were charging you $50, I'm going

2  to charge you $100.  Oh, and I'm also supposed to grow it.

3  Well, he grew it 50 percent.  They said he needs to grow it

4  another 50 percent.  Their argument is, if he had just been a

5  great enough businessman, Your Honor, he would have made

6  enough money, this never would have been an issue, we never

7  would have been found out.  He would have made some profit

8  and it would have been okay.

9      Well, that's not the standard.  The way they want to read

10  FIPA, reads FIPA right out of FIPA.  There is nothing left.

11  I mean, there is nothing there when they say:  Hey, we've

12  done everything we had to.  We were totally up front.  The

13  kickback provisions that we're getting better deals after the

14  fact, well, Mr. Brewer is not there any longer, Your Honor,

15  so whatever benefits they're getting, he's not getting them

16  from this provision.  He wasn't told about it.  He wasn't

17  given the option to say:  Did you understand that for every

18  dollar you're going to pay for printing costs, they're going

19  to charge you another dollar, dollar-fifty?  Would you have

20  signed up for that deal?  FIPA says, no, too bad, that's

21  illegal.  It's improper.  Can't do it.

22      More importantly, all those things he said that Mr. Martin

23  says in his ten pages of declaration, Your Honor, about again

24  the great proprietary system of how the insertion, and the

25  shipping -- well, those are all line item charges we already

1   get.  All that sounds like overhead.  We developed this

2   process.  Overhead.  Good.  You developed these processes.

3   It's overhead.  If you want to shove it in printing costs

4   that you represent is the cost of printing that we're being

5   charged, and we went out -- unquestioned, they don't deny it

6   -- we went out and got the best rates possible.  We used to

7   do it in-house, but now we've got even better rates.  You

8   know, they're going up a little bit, you know how the world

9   is.  Mr. Brewer is not told:  Oh, printing costs are only

10  half of that, the rest is our overhead, and, you know,

11  Mr. Craciun's bonus, and whatever else is going on in the

12  company.  That's not fair, Your Honor, and that's what FIPA

13  is about, it's all for the benefit of the franchisee.

14      The last thing I would say is, I'm not saying *Nelson* is

15  the clearest case in the world.  But you know what *Nelson*

16  didn't say -- and this is the Supreme Court, this isn't some

17  unpublished Court of Appeals decision -- *Nelson* didn't say,

18  oh, based on the evidence at trial, the trial court was

19  correct that there was sufficient evidence to justify it.

20  That's not what they said.  *Nelson* went a lot further than

21  that.  And they didn't use a dollar amount, which makes

22  sense, they used a percentage.

23      But even if you said, I don't know if 20 percent is really

24  per se unfair, although I think that's what *Nelson* says,

25  whether we think it's weird or not, that's not for us to

1   decide actually, because they are the highest speaker on

2   state-law interpretation.  How can any reasonable fact

3   finder -- if we're going to talk about fair and just --

4   forget the disclosure, which I think they're dead in the

5   water, that's all you need to do -- how would any factfinder

6   say that 110 to 150 percent undisclosed markup that is not

7   printing costs, not fixed costs, it's your overhead and other

8   things, how would that be fair and reasonable?  How would any

9   factfinder find that?

10       Courts don't use it very often, Your Honor, but they

11  should, which is, no reasonable factfinder would find that's

12  reasonable.  Nobody would find that you marking it up that

13  much and not telling someone about it makes it fair and

14  reasonable.  They took that away from Mr. Brewer.  And that's

15  what FIPA says you can't do.  You should have gave them the

16  choice.  Then we'd have a different situation.  Hey, it's a

17  service fee.  Hey, it's a royalty fee.  It covers our

18  overhead.  This is what we do to make money.  They didn't do

19  that, Your Honor.

20       Any questions, Judge?  I'd be happy to answer them.

21          THE COURT:  No, I'm good.  Thank you.  I appreciate

22  it.  And I know that we also have Mr. Brewer's motion for a

23  brief continuance of the trial date and related deadlines,

24  that just became fully briefed last week.  And I will get a

25  ruling out on both those matters this week.  Okay?  So you

1    will be told where we stand at the end of this week.  Okay?

2    Thanks very much, counsel.  Appreciate it.

3                        (Adjourned.)

4

5                 C E R T I F I C A T E

6

7

8        I certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.

10

11

12

13   */s/ Debbie Zurn*

14   DEBBIE ZURN
     COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25